No. 22-10772

In the United States Court of Appeals
For the Fifth Circuit

———————————————

Adam A. Malik; Malik & Associates, P.L.L.C.,

Plaintiffs-Appellants

v.

United States Department of Homeland Security; U.S. Customs &
Border Protection; Alejandro Mayorkas, Secretary, U.S.
Department of Homeland Security; Chris Magnus, Commissioner,
U.S. Customs and Border Protection,

Defendants-Appellees

———————————————

On Appeal from the United States District Court for the
Northern District of Texas, Fort Worth Division,
4:21-cv-0088-P

———————————

**REPLY BRIEF FOR THE APPELLANTS**

———————————

Roy Petty
Roy Petty & Associates, PLLC
8700 N. Stemmons Fwy, Ste 101
Dallas, TX 75247
(214) 905-1420
*Counsel for Appellants*

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................... i

INDEX OF AUTHORITIES ..................................................... iii

Introduction ......................................................................... 1

1.  The grant of summary judgment was improper ................................. 2

1.1 Contested issues of material fact remain ...................................... 2

1.2 The legality of the composition of the CBP Filter Team is disputed. ................................................................................ 4

1.3 The reason for the transfer of the iPhone from El Paso to Houston is disputed ......................................................................... 6

1.4 The court failed to view all facts and inferences in the light most favorable to the non-moving party .......................................... 8

2.  The Decision is unreviewable because the district court failed to articulate the applicable legal standard ................................... 10

3.  The government's warrantless seizure and forensic examination of the Attorney's confidential and privileged information downloaded from a remote server violated the Fourth Amendment ................................. 13

4.  The DHS had no authority to forensically examine the iPhone ...... 21

5.  The Attorney has demonstrated sufficient injury to establish standing ............................................................................. 22

6.  The District Court improperly denied the Attorney's timely Motion for 90 additional days of discovery on issues raised in Wyden I ............ 26

CONCLUSION ................................................................... 29

CERTIFICATE OF COMPLIANCE..........................................................31

CERTIFICATE OF SERVICE................................................................32

# INDEX OF AUTHORITIES

## Cases

*Adickes v. S. H. Kress & Co.*,
398 U.S. 144, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970) ........................... 20

*Barker v. Norman*,
651 F.2d 1107 (5th Cir. 1981) ................................................................ 19

*Bernard v. Gulf Oil Co.*,
596 F.2d 1249 (5th Cir. 1979), on reh'g, 619 F.2d 459 (5th Cir. 1980),
aff'd, 452 U.S. 89, 101 S. Ct. 2193, 68 L. Ed. 2d 693 (1981) .................. 20

*City of Arlington, Tex. v. F.C.C.*,
569 U.S. 290, 133 S. Ct. 1863, 185 L. Ed. 2d 941 (2013) ....................... 21

*Env't Def. Fund v. Marsh*,
651 F.2d 983 (5th Cir. 1981) .................................................................. 20

*Harbor Healthcare Sys., L.P. v. United States*,
5 F.4th 593 (5th Cir. 2021) ..................................................................... 25

*Impossible Elec. Techniques, Inc. v. Wackenhut Protective Sys., Inc.*,
669 F.2d 1026, 1031 (5th Cir. 1982) ................................................. 18, 20

*Isquith ex rel. Isquith v. Middle S. Utils., Inc.*,
847 F.2d 186 (5th Cir. 1988) .................................................................. 10

*King v. Dogan*,
31 F.3d 344 (5th Cir. 1994) .................................................................... 19

*New York v. Belton*,
453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981) ........................... 16

*Riley v. California*,
573 U.S. 373, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014) ...... 15, 16, 17, 20

*United States v. Cotterman,*
709 F.3d 952, 968 (9th Cir. 2013) ......................................................... 12

*United States v. Jarman,*
847 F.3d 259 (5th Cir. 2017) ................................................................. 11

*United States v. Kolsuz,*
890 F.3d 133, 141 (4th Cir. 2018), *as amended* (May 18, 2018), ............ 12

*United States v. Ritchey,*
No. 1:21-CR-6-HSO-RPM, 2022 WL 3023551 (S.D. Miss. June 3, 2022). 5

## Statutes

19 U.S.C. § 1467 ...................................................................................... 22

19 U.S.C. § 1582 ...................................................................................... 21

## Other Authorities

Guidelines on Mobile Device Forensics, Special Publication 800-101,
National Institute of Standards & Technology (May 2014) ................... 18

## Rules

FED. R. CIV. P. 56(e) ............................................................................... 19

## Regulations

19 C.F.R. § 162.6 ..................................................................................... 21

# Introduction

The government maligns the Attorney through incomplete facts and innuendo in its response so the Court must look through the government's hyperbole.[1] The district court interpreted all facts and inferences against the Attorney. That is reversible error.

Evidence that the government claims is uncontroverted really is controverted. Other evidence relied upon by the district court and the

---

[1] The government implies that the Attorney falsified passport applications, which is a crime. Gov't Brief at 5. In reality, the alleged discrepancies in place of birth were akin to an applicant saying that he was born in Ft. Worth on one application and Tarrant County on another application. There was no indication that any of the passport applications of the Attorney was ever denied. The government neglects to say that the interviewing officer was satisfied with the Attorney's answers about the alleged discrepancies, indicating that no further investigation into the passport applications was warranted. ROA.1480.

The government quotes a remark that the Attorney was 'linked to' an arms dealer who had previously come to CBP's attention in Dallas. Gov't Brief at 7. The government neglects to note that the alleged arms dealer is not and never was the Attorney's client. The Attorney has a client with the same name. ROA.828.

The government claims that the Attorney's "brother was in contact or affiliated with representatives of the Pakistani military and/or ISI." Gov't Brief at 9. The government addressed the allegation in a report that text messages with such officials were found on the brother's cellphone. ROA.1149. The government, however, never provided any such text messages or the words or context of those alleged messages. What is left unsaid is that the brother worked for a multinational company that sold computer equipment to many governments, including the government of Pakistan.

Similarly, the government never addressed that the alleged photographs of dead bodies on the cellphone of the brother were from news articles cached to the cellphone about atrocities committed against the Kashmiri people. ROA.1302.

government is contrived, and in some instances, is flatly contradicted by the government's own evidence.

## 1. The grant of summary judgment was improper

Numerous contested issues of material fact remain, many of which the district court summarily and improperly resolved in favor of the government.

### 1.1    Contested issues of material fact remain

CBP Chief Pequano explained why the Attorney was stopped and his iPhone was forensically examined.

> [T]his was strictly part of the inspection process to try to determine that relationship between [the alleged arms dealer] and Mr. Malik to see if [the alleged arms dealer] was attempting to establish other means to get a visa to return to the United States."[2]

The government forensically examined the iPhone to know how the Attorney, an immigration attorney, was going to use the visa process to legally seek a visa from the U.S. government for an alleged arms dealer.

---

[2] ROA.976.

The district court rejected the single reason given by the CBP Chief in charge of the forensic examination to give two independent reasons why the government forensically examined the iPhone:

> Reason 1: the government's investigation into an international arms dealer with known ties to the Dallas area supported the search of the iPhone.

> Reason 2:  the information discovered during the Government's interview with Mr. Malik's brother—who Mr. Malik was traveling with and hosting in the United States—independently supported the search of the iPhone.

Reasons 2 is contrived and first arose in the government's motion for summary judgment without citation or evidentiary support.[3] CBP Chief Michael Pequano was asked in deposition about what later became Reason 2.

> Q. So, to your knowledge, was there anything in the rationale for not allowing Mr. Malik's brother in - - was there anything in that information that affected what happened to Mr. Malik?

> A. Not that I'm aware of.[4]

In fact, Mr. Malik's brother was not even interviewed until <u>after</u> the government had finished interviewing the Attorney, <u>after</u> the

---

[3] ROA.613.
[4] ROA.1473.

government seized the iPhone, and <u>after</u> the government informed the

Attorney that his iPhone would be searched.

> Q. Okay. Did you have any contact or any conversation at all with
> Mr. Malik's brother who arrived with him?
> A. I did.
> Q. You did?
> A. Yes
> Q. Was that before you talked to Mr. Malik?
> A. No.
> Q. It was after.[5]

When CBP officers decided to search the iPhone, the officers had not yet

interviewed Mr. Malik's brother. Reason 2 is contrived and directly

contradicts CBP Chief Pequano.[6]

## 1.2   The legality of the composition of the CBP Filter Team is disputed.

The government argues that the composition of the filter team

was undisputed. Gov't Br. at 44. Appellees have no rules regarding

filter teams. Despite the government's argument, contested factual

issues remain regarding the government's use of a filter team composed

solely of CBP Chief Gaytan (a nonattorney) who made the decisions

regarding privilege and two CBP attorneys with whom she consulted

---

[5] ROA.1477; ROA.1478.
[6] Officer Cannon told the Attorney that he wanted to search the iPhone prior to his leaving to speak with the Attorney's brother. "So – so what I did was I told him that I'd like to take a look at his phone." ROA.1475.

when she had questions. ROA.1501; ROA.1006. CBP Chief Gaytan claimed "border search authority" as her authority to read the 70,000 privileged emails and 2000 client files of the Attorney. ROA.1006.

The government was put on notice by the verified complaint that the Attorney was seeking the appointment of a special master and an injunction prohibiting CBP's review of the Attorney's iPhone.

Use of employees of the same agency has not only the *imprimatur* of bias but is actual bias. This case raises many of the same filter team issues that the district court found to require reversal in *United States v. Ritchey*, No. 1:21-CR-6-HSO-RPM, 2022 WL 3023551 (S.D. Miss. June 3, 2022). The filter team did not give the appearance of a neutral non-party—CBP Chief Gaytan is an actual adverse party and she decided what was privileged. ROA.1006.

There was no objections period provided and no opportunity given to Attorney's clients to object to the review and possible retention of their confidential information and data. The filter team made unilateral determinations of privilege without input or agreement by the Attorney or his clients before releasing the allegedly nonprivileged data back to her underlings at the DFW airport. This Court should adopt the district

court's holding in *Ritchey*. "It is well-established that protection of the attorney-client privilege typically supports the public interest." "[T]he existing filter team protocol will only undermine Ritchey's privilege." *United States v. Ritchey*, 2022 WL 3023551, at *8.

The idea of a filter team in this case is bizarre considering that the sought-after information necessarily was attorney-client privileged. The depositions were not clear as to whether the government identified the file of the client who has the same name as the person of interest.

Every unredacted word of the Attorney's confidential information was read by the CBP Chief Gaytan. ROA.1501; ROA.1006. There is actual bias demonstrated by the composition of the filter team and the absence of filter team rules because the CBP Chief may be transferred to DFW or elsewhere to act against the Attorney's clients. The government offered the Attorney no input as to the composition of any filter team. The Attorney asked for a special master.

### 1.3 The reason for the transfer of the iPhone from El Paso to Houston is disputed

The evidence shows that the Attorney's cell phone was seized by

CBP at DFW airport and then transferred to a lab in El Paso before being transferred to a lab in Houston. Gov't Br. at 10-11. The government claims that the iPhone was transferred to Houston from El Paso because the iPhone could not be opened at the El Paso Lab. Gov't Br. at 10. However, no evidence to that effect from the El Paso lab was provided, only the nonevidentiary statement of counsel. Factual issues remaining in dispute include: What happened in the El Paso lab and did that lab send a copy of the data elsewhere?

The Declaration of Gary J. Hale[7] and Wyden II support the Attorney's claim that the metadata and confidential client data have been retained, most likely in the centralized database described by Hale and Wyden II. Hale explains how the intelligence community gets around Congressional limits on targeting of U.S. citizens under Title 50 of the U.S.C. by using law enforcement in the manner as described by Wyden I. ROA.1677.

The government produced evidence stating only what CBP has allegedly done with the data, but whether artfully or carefully, the evidence does not include what DHS did with the data. Neither the

---

[7] ROA.1670-1684.

language used by CBP Chief Gaytan in her affidavit, nor the argument of counsel foreclose the possibility of transfer of the Attorney's data to the central database, possibly maintained by a nongovernmental organization, as described in Wyden I and II.

### 1.4   The court failed to view all facts and inferences in the light most favorable to the non-moving party

Reason 1 (connection with alleged arms dealer) is an overly broad statement that arises from implausible allegations that are inferred against the Attorney. Much like the government's implied allegation that the Attorney falsified his passport applications (which the government unsuccessfully argued before the district court without evidence as a third reason for the search),[8] Reason 1 has connotations that the relationship between the Attorney and the alleged client is sinister and worthy of federal investigation.

The evidence shows no reason to believe that the Attorney was involved in any criminal or inappropriate activity. According to CBP Chief Pequano, the government wanted to know how the Attorney was

---

[8] ROA.613.

8

going to apply for a visa for his client and so it searched 70,000 pages of emails and 2000 client records to try to get the information.[9]

The record shows that 218 persons just on LinkedIn have the same name as the person of interest ("POI").[10] Yet the government asks the Court to believe that an "open source" search of the name of the POI took them directly to the Attorney.

Leaving aside the hyperbole of the Pakistani press, an alternative interpretation of the evidence obtained by the Attorney shows that the "international arms dealer" is an international marksman who applied for admission to the United States, was granted admission by the DHS, and participated in a shooting competition at the invitation of the NRA. He returned to Pakistan with the guns that he had taken for the competition and replacement ammunition as permitted under international law.[11]

The government's hair-on-fire reliance on the Pakistani press for its supposed justification of the forensic examination, rather than

---

[9] The government never found what it was looking for because the Attorney's client was not the person of interest.
[10] ROA.947.
[11] ROA.1504; ROA.1505; ROA.1506.

accessing the Department of State visa applications, further demonstrates that Reason 1 is implausible.

The government claims that because the international marksman was allowed to return to the United States he must have high level connections within the Pakistani government.[12] Equally plausible, when viewed in the light most favorable to the Attorney, is that the marksman was allowed to return to the United States because the U.S. Department of State gave him a visa; and, his visa was not canceled because he did nothing wrong.

### 2. The Decision is unreviewable because the district court failed to articulate the applicable legal standard

The Attorney relies on *Isquith ex rel. Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186 (5th Cir. 1988) to show that the Decision is inadequate as a matter of law and vacatur and remand are appropriate. The government argues that *Isquith* is not applicable because the Decision articulates the applicable legal standard, i.e., reasonable suspicion.[13] The government begs the question. Reasonable suspicion of what? Reasonable suspicion that the iPhone contained digital

---

[12] Gov't Brief at 5.
[13] Gov't Brief at 45.

contraband like pornography? Reasonable suspicion that the iPhone contained evidence of a crime like a list of drop locations for illegal drugs?

The government argues that Reason 1 (connection with alleged arms dealer) and Reason 2 (connection with the brother) constitute sufficient reasonable suspicion of something.[14] As previously addressed, Reason 1 is implausible and Reason 2 is contrived.

The government and the Decision cite *United States v. Jarman*, 847 F.3d 259 (5th Cir. 2017). That case involved the examination of the cellphone of an attorney accused of possessing child pornography. The government obtained a search warrant for the cellphone to look for child pornography and found it. Jarman challenged the sufficiency of probable cause for the search warrant. In the instant case, the Attorney is accused of nothing criminal and no judicial search warrant was obtained.

The government refers to the cases cited in footnote 8 of the Decision as further evidence of clarity of the applied legal standard.[15] In

---

[14] Gov't Br. 44-45.

[15] Gov't Br. at 46.

11

*United States v. Kolsuz*, 890 F.3d 133, 141 (4th Cir. 2018), *as amended* (May 18, 2018), the court found that the government had reasonable suspicion that a cell phone would "reveal evidence of both past and ongoing attempts to export firearms parts illegally." In *United States v. Cotterman*, 709 F.3d 952, 968 (9th Cir. 2013), the court defined reasonable suspicion as "a particularized and objective basis for suspecting the particular person stopped of criminal activity."

None of these cases clear-up what the district court meant by reasonable suspicion. No allegation was made that the government had reasonable suspicion that the iPhone contained any evidence of digital contraband or a crime as in *Kolsuz* and *Cotterman*.

In fact, a careful reading of the government's discussion of the alleged arms dealer <u>never</u> says that the arms dealer was accused of any crime against the United States. But that point is not relevant because the purpose of seizing and forensically examining the iPhone, according to CBP Chief Pequano, was to obtain information about how the Attorney would apply for a visa for his alleged client.

The problematic disputed factual issues, a summary finding of "reasonableness," and citation to cases that do not apply to the facts make the Decision unreviewable.

### 3. The government's warrantless seizure and forensic examination of the Attorney's confidential and privileged information downloaded from a remote server violated the Fourth Amendment

Rather than address the Fourth Amendment implications of the warrantless downloading of the Attorney's data from a remote server, the government argues that the Attorney waived the issue. In the Attorney's verified complaint, motion for summary judgment, response to the government's motion for summary judgment, and opening brief, the Attorney argued that the warrantless seizure and forensic examination of the automatic downloads violated the Fourth Amendment.

The government says that "Malik also briefly asserts that there were 'two-hours of confidential information automatically downloaded to his phone after it had been detained by CBP." Gov't Br. at 47. The two hours of downloads are amply (not briefly) addressed in the Attorney's Brief on pages 22, 23, 33, 37, and 44.

Second, the government says that "Malik does not cite anything in the record for this assertion." *Gov't Br. at 47.* Page 11 of the Attorney's Brief cites ROA.1576, showing that the iPhone was formally detained by CBP Officer Sullivan at 8:00 pm, and ROA.1011, showing that the iPhone was not turned off until 9:57 pm. Page 11 cites ROA.1011 showing that 177KB of data was uploaded from the iPhone to the cloud and 369 KB of data was downloaded to the iPhone during those two hours. Page 11 cites ROA.1015 showing that the size of the report of the expert witness is 24.7KB, which for comparison is only 15 percent of the total data downloaded during the two hours that the iPhone remained connected to the cloud after its seizure.

The two hours of downloaded data from remote servers was not accidental but intentional[16] and in keeping with an agency policy to not disconnect the device from the network until the search begins.[17] The

---

[16]    Q. And in this case, knowing what you know about what happened here, is this a situation where the iPhone should have been placed in airplane mode before it was – once it was detained by CBP?

    A. In my opinion, no.

ROA.883 (Deposition of CBP Chief Pequano).

[17]    A. What I do know is that when we begin a search, the – the phone is to be

14

result is to maximize the amount of data downloaded from remote servers to maximize the area of the search.

Third, the government argues that the Attorney waived his argument because he never "cited any authority showing that the timing of when CBP powered off the phone was legally improper." Gov't Br. at 48.

Whether the government warrantlessly downloaded documents from a remote server for one hour or two hours is an attempt to distract that the Fourth Amendment required a warrant to seize that data. Despite the government's claim to the contrary, the Attorney cites *Riley v. California*, 573 U.S. 373, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014), on page 44 of his brief for the proposition that a warrant was required to download that data. *Riley* specifically addresses the concern that is present here, *i.e.*, a cellphone draws data from remote servers and a warrant is required to search that data.

---

placed in airplane mode.

ROA.883 (Deposition of CBP Chief Pequano). Compare, § 5.1.2 of the Directive requiring that the traveler disable connectivity unless national security warrants otherwise.

The automatic pulling of data from remote servers to a cellphone underpins the *Riley* decision that the search incident to a lawful arrest exception does not apply to cellphones. With regard to cellphones, the Supreme Court found "the data viewed on many modern cell phones may in fact be stored on a remote server. Thus, a search may extend well beyond papers and effects in the physical proximity of an arrestee, a concern that the United States recognizes but cannot definitively foreclose." *Riley v. California*, 573 U.S. at 375, 134 S. Ct. at 2479.

No court has ruled that the border search exception extends to allowing the government to use an electronic device seized at the border to intentionally and warrantlessly seize and forensically examine data residing on servers in the American heartland.

Cellphones, whether found at the border or in the heartland, are fundamentally different from containers such as boxes, file folders, luggage, and purses which may be searched at the border.

> To further complicate the scope of the privacy interests at stake, the data a user views on many modern cell phones may not in fact be stored on the device itself. Treating a cell phone as a container whose contents may be searched incident to an arrest is a bit strained as an initial matter. See New York v. Belton, 453 U.S. 454, 460, n. 4, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981) (describing a "container" as "any

16

object capable of holding another object"). But the analogy crumbles entirely when a cell phone is used to access data located elsewhere, at the tap of a screen. That is what cell phones, with increasing frequency, are designed to do by taking advantage of "cloud computing." Cloud computing is the capacity of Internet-connected devices to display data stored on remote servers rather than on the device itself. Cell phone users often may not know whether particular information is stored on the device or in the cloud, and it generally makes little difference. See Brief for Electronic Privacy Information Center in No. 13–132, at 12–14, 20. Moreover, the same type of data may be stored locally on the device for one user and in the cloud for another.

*Riley v. California*, 573 U.S. at 397, 134 S. Ct. at 2491. The Attorney's iPhone is not a container or a piece of luggage for purposes of the Fourth Amendment because it automatically draws data from remote servers. Here, the government took advantage of that characteristic by allowing the iPhone to download data from remote servers to intentionally expand the area of the warrantless search.[18]

---

[18] The government easily could have removed the battery from the iPhone or turned it off to prevent the downloading of data, if limiting the search area was the intended purpose. See ROA.1011. Doing so is the best practice for law enforcement and forensic examiners.

> Isolating a mobile device from all radio networks (e.g. WiFi, Cellular and Bluetooth) is important to keep new traffic, such as SMS messages, from overwriting existing data. Besides the risk of overwriting potential evidence, the question may arise whether data received on the mobile device after seizure is within the scope of the original authority granted.

17

The government argues that the Attorney has the burden of showing that the downloaded data contains "any specific substantive 'confidential' content (e.g., a text message or email)." Gov't Br. at 48.

The Fourth Amendment does not require an analysis of whether the data downloaded from the remote server is confidential. The Attorney, as well as all international travelers, has a reasonable expectation of privacy in data that resides on remote servers when an electronic device is seized regardless whether that remote data consists of attorney/client communications or an email sent by a child away at university complaining about a professor.

The government, not the Attorney, had the burden in its motion for summary judgment to show that the two hours of intentionally downloaded data was something other than confidential. "The party seeking summary judgment bears the exacting burden of demonstrating that there is no actual dispute as to any material fact in the case." *Impossible Elec. Techniques, Inc. v. Wackenhut Protective Sys., Inc.*, 669 F.2d 1026, 1031 (5th Cir. 1982).

---

Guidelines on Mobile Device Forensics, Special Publication 800-101 § 4.3 National Institute of Standards & Technology (May 2014), available at http://dx.doi.org/10.6028/NIST.SP.800-101r1.

Paragraphs 28 and 29 of the verified complaint allege that the downloaded data was confidential and privileged. "A plaintiff's verified complaint can be considered as summary judgment evidence to the extent that it comports with the requirements of FED.R.CIV.P. 56(e)." *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994), *citing Barker v. Norman*, 651 F.2d 1107, 1114–15 (5th Cir. 1981). The government, which intentionally downloaded the data in violation of the Directive, forensically examined the data and still retains that data today, producing no evidence that the downloaded data was anything other than confidential and privileged as alleged in the verified complaint. Not one scintilla of evidence contradicts the Attorney's sworn claim. In fact, the government did not even challenge that the downloaded data was anything other than confidential or privileged until the government's response brief.

In the absence of any evidence to the contrary, the Attorney had no obligation to put forward any additional evidence about the confidential and privileged nature of the data. "Moreover, the party opposing a motion for summary judgment need not respond to it with any affidavits or other evidence unless and until the movant has

properly carried its burden." *Impossible Elec. Techniques, Inc. v. Wackenhut Protective Sys., Inc.*, 669 F.2d 1026, 1031 (5th Cir. 1982) *citing* Adickes v. S. H. Kress & Co., 398 U.S. at 160, 90 S.Ct. at 1609-10; Environmental Defense Fund v. Marsh, 651 F.2d at 991; Bernard v. Gulf Oil Co., 596 F.2d 1249, 1255 (5th Cir.), *on reh'g*, 619 F.2d 459 (5th Cir. 1980), *aff'd*, 452 U.S. 89, 101 S. Ct. 2193, 68 L. Ed. 2d 693 (1981). The government never carried its burden because it presented no proof whatsoever that the warrantlessly downloaded data was anything other than confidential or privileged.

The warrantless seizure and examination of the data downloaded from the remote server are precisely what concerned the *Riley* Court. *Riley* requires the government to obtain a warrant to search any data downloaded from remote servers.

Because the 369 KB of downloaded data now is commingled with other data that was on the iPhone at the time of the seizure, the government was required to obtain a judicial warrant to forensically examine the iPhone to comply with *Riley*.

## 4. The DHS had no authority to forensically examine the iPhone

The government argues that the Attorney misunderstands the Directive and the border search authority of DHS. Gov't Br. at 48-49.

While the United States may have plenary authority to conduct searches and inspections that comply with the U.S. Constitution, Congress legislated the confines of DHS's border search authority. "No matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, whether the agency has stayed within the bounds of its statutory authority." City of Arlington, Tex. v. F.C.C., 569 U.S. 290, 297, 133 S. Ct. 1863, 1868, 185 L. Ed. 2d 941 (2013).

Congress authorizes searches of (1) persons and (2) baggage under 19 U.S.C. § 1582. An iPhone is neither a person nor baggage. Hence, DHS has no search authority because Congress limited that authority. Even if an iPhone is seen as a person or baggage, the statute requires that any search must be conducted under a federal regulation and not any agency directive. The regulation is 19 C.F.R. § 162.6 which says, *inter alia*, that

> All persons, baggage, and merchandise arriving in the Customs territory of the United States from places outside thereof are liable to inspection and search by a Customs officer. Port directors and special agents in charge are authorized to cause inspection, examination, and search to be made under section 467, Tariff Act of 1930, as amended (19 U.S.C. 1467) . . . .

The regulation distinguishes between "inspection and search" and "inspection, examination, and search." An examination may be intrusive, and inspections, examinations, and searches are appropriately limited by 19 U.S.C. § 1467. The examination must be "for the purpose of assuring compliance with any law, regulation, or instruction which the Secretary of the Treasury or the Customs Service is authorized to enforce." Any examination of the iPhone would be authorized only to the extent to assure compliance with a law, regulation, or instruction. The government never pointed to any such reason to justify the search.

## 5. The Attorney has demonstrated sufficient injury to establish standing

The government erroneously contends that the Attorney has no standing for declaratory or injunctive relief because the Attorney alleges only past harm and no continuing harm or future harm. *See*

Gov't Br. at 24. The government chides the Attorney for not putting forth new evidence of harm on appeal and then chides the Attorney when he does (e.g., CBP handcuffing the Attorney upon arrival in apparent retaliation). The Attorney is mindful that this Court may not consider facts not properly before the district court at the time of the Decision.

The issues of what was seized, how many copies of the seized data exist, and whether they were destroyed or not arose and remain unresolved today. The Decision sets aside the evidence to resolve those issues in favor of the government.

The Attorney remains harmed because the location of and number of the government's copies of the Attorney's client files remain unclear, particularly in light of the revelations of Wyden II. The government addresses in its brief, through non-evidentiary argument, that the master copy of the Attorney's data in its possession is the only copy of the Attorney's data. The government explains, again through non-evidentiary argument, that all other copies were destroyed. Gov't Br. at 14.

Counsel for the Attorney was not made aware of this revelation until reading the government's brief. No evidence of the destruction of the Attorney's data was provided to the district court. In fact, the revelation contradicts the government's earlier statement to the district court that it could not destroy the Attorney's data because of an alleged litigation hold.[19] The government appears to admit to spoliation of evidence or worse.

Even bolder, the government attempts to re-write the sworn statement of CBP employee Anniebeth Labiosa to conform to the Decision. The statement is found at ROA.1138. See Gov't Br., p. 11 fn. 6. The government urges this Court to close its eyes to her carefully written statement and to accept that she really meant to say that the government did not give the Attorney's data to anyone.

Assuming for argument that the only copy of the data is that held by the U.S. Attorney's Office, the Attorney still is harmed and still has standing. The Attorney never asked for a litigation hold of the seized data. The government merely repeats the allegation and cites to

---

[19] See ROA.1718; ROA.1719. The government argued before the district court that the Attorney would have "cried foul" if data was deleted.

ROA.57 which does not say what the government and the Decision claim that it says.

The Attorney never asked the government to seize the iPhone, download the contents of his confidential communications from a remote server, or forensically examine the data. The government's argument is akin to unlawfully taking the Attorney's car and saying that the government does not have to give it back now because of a litigation hold. To continue the analogy, the government would be saying that the Attorney would have no standing for the return of the taken car because the car is impounded only pending the litigation and that the court should dismiss that litigation so that the car could be returned.

As argued by the Attorney and not addressed by the government, *Harbor Healthcare Sys., L.P. v. United States*, 5 F.4th 593 (5th Cir. 2021) provides the answer. "The Attorney remains injured as long as the government retains its privileged documents. That injury can only be made whole by the government returning and destroying its copies of the privileged material." *Harbor Healthcare Sys., L.P. v. United States*, 5 F.4th at 600. The Attorney suffers the same continuing harm suffered

by Harbor and has standing in this matter to contest the harm to himself and his clients.

### 6. The District Court improperly denied the Attorney's timely Motion for 90 additional days of discovery on issues raised in Wyden I

The government opposed the Attorney's Motion to Modify Scheduling Order ("Motion") as requiring a new Complaint and not being relevant to the claims in the verified complaint. Gov't Br. at 53. The motion was timely filed and no new complaint was necessary because the issues raised by Wyden I, and upon which discovery was sought, go to the heart of the complaint and still is unresolved—where are the 70,000 pages of the Attorney's emails and the files of his 2000 clients?

The government attempts to argue irrelevancy by saying that the agency at issue in Wyden I is HSI and not CBP. That argument fails because DHS and the Secretary are parties to the lawsuit, with CBP. Paragraph 45 of the verified complaint alleges "Officer Sullivan informed Mr. Malik that DHS was seizing the iPhone and that the digital contents would be searched." ROA.19. The Attorney never alleged that CBP acted alone. Discovery about TRAC, whose databasing

26

and allowing access by local law enforcement to confidential and unlawfully obtained data by DHS, is directly relevant and necessary.

The Attorney retained expert Gary J. Hale to explain the relevance of Wyden I to the district court. ROA.1670-1684. The use of nongovernmental servers by CBP and DHS to store seized electronic information of Americans was unknown to the Attorney and not reasonably discoverable prior to the close of discovery when Senator Wyden wrote his letter.

Prior to the release of Wyden I, the Attorney had no reason to inquire about the use of nongovernmental servers because the use was unknown, not revealed by the government, and believed to be unlawful. In fact, the government even hid that use from Congress until discovered by Senator Wyden.

The Attorney timely moved the district court to allow him discovery on the use of these nongovernmental servers to database data seized by DHS and its publishing the content to local law enforcement. Use of such servers would demonstrate a clear violation of the attorney client confidentiality privileges and of the Attorney's constitutional

rights. The Attorney supported the timely motion with relevant expert testimony. ROA.1670-1684.

After the Decision, Sen. Wyden released a second letter, on September 15, 2022, (Wyden II) confirming what the Attorney had argued in his motion.

> In a June 20, 2022 briefing to my office, CBP estimated that it forensically examines and then saves data from "less than 10,000" phones per year – which typically includes text messages, call logs, contact lists, and in some cases, photos and other sensitive data – in a central database. CBP confirmed during this briefing that it stores this deeply personal data taken, without a warrant signed by a judge, from Americans' phones for 15 years and permits approximately 2,700 DHS personnel to search this data at any time, for any reason.

Record of Excerpts p. 41. (Doc. 28). The government's potential handling of the Attorney's seized data as explained by the expert witness who studied Wyden I was verified as largely correct by the revelations of Wyden II. This revelation clearly supports Hale's informed opinions regarding the contents of the iPhone and the two hours of downloaded data being stored in a central database.

Unresolved is whether local law enforcement and other federal agencies (and their contractors) also have access to the central

database, which likely now includes the client files of the Attorney. Further discovery pursuant to Wyden I and II is likely to reveal further harm to the Attorney and his clients if the facts are viewed in the manner most favorable to Attorney.

Further discovery is demonstrably required and merited. Discovery was timely requested by the Attorney for concerns that were plausible under Wyden I and proven accurate under Wyden II. Summary judgment should be reversed, and this matter remanded to the district court for further discovery based on the revelations of the two Wyden letters. The characterization of the Attorney and the Attorney's brother would be defamatory but for the absolute litigation privilege.

## CONCLUSION

Because of the foregoing, the Court should reverse the Decision as requested in the Attorney's opening brief.

//
//
//
//
//

Respectfully submitted,

*/s/ Roy Petty*

Roy Petty
Texas Bar No. 24043870
Roy Petty & Associates, PLLC
8700 N. Stemmons Fwy, Ste 101
Dallas, TX 75247
Telephone (214) 905-1420
Fax (214) 905-2010
roy@roypetty.com

# CERTIFICATE OF COMPLIANCE

I certify that:

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 6,496 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32.2.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point font.

3. Any required privacy redactions have been made pursuant to Circuit Rule 25.2.13, the electronic submission is an exact copy of the paper submission, and the brief has been scanned for viruses using Bitdefender Endpoint Version 7.7.1.216 and is free of viruses.

Dated: February 1, 2023                    */s/ Roy Petty*

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

Dated: February 1, 2023                    */s/ Roy Petty*